No. 03-556

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 216

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

CHRISTOPHER THOMAS HILL,

        Defendant and Appellant.


APPEAL FROM:    The District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 2002-284,
Honorable Mike Salvagni, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

            Mariah A. Eastman, Public Defender, Bozeman, Montana

        For Respondent:

            Honorable Mike McGrath, Attorney General; Micheal S.
Wellenstein, Assistant Attorney General, Helena, Montana

            Marty Lambert, County Attorney; Gary Balaz, Deputy
County Attorney, Bozeman, Montana


Submitted on Briefs:  November 4, 2004

Decided:  September 6, 2005


Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Christopher Hill appeals from the judgment entered by the Eighteenth Judicial District Court, Gallatin County, finding him guilty of robbery.  We affirm.

¶2     We consider the following issues on appeal:

¶3     Did the District Court abuse its discretion when it denied the defendant's motion for directed verdict on the issue of identification of the defendant as the perpetrator?

¶4     Should this Court invoke the doctrine of plain error to review Hill's claims regarding the State's Information, and if so, did the Information properly charge an offense?

## BACKGROUND

¶5     Late on the evening of September 29, 2002, and into the following early morning, Richard Hughes and William Nutter were stocking groceries at Lee and Dad's IGA in Belgrade, Montana.  At around midnight, a man later identified as Brian Hawk, walked into the store and, roughly ten to fifteen minutes later, attempted to walk out with several items without paying, including, at least, several DVDs and two rib-eye steaks.  As Hawk exited the store, Hughes, who had seen Hawk stuff some DVDs in his coat, confronted him and succeeded in leading Hawk back into the store.  Hughes told Hawk that he was suspected of shoplifting, and he instructed Hawk to empty his pockets onto the counter.

¶6     As Hughes was telephoning the police about the shoplifting, Hawk, after leaving several items on the counter, bolted for the exit doors at the other end of store.  Nutter, whom Hughes had paged for assistance, pursued Hawk outside.  As Nutter was trying to tackle Hawk on the sidewalk, Hughes observed through a window a man standing by the trash can

outside looking through the window into the store. Suddenly, the man moved, and Hughes put down the phone and ran for the door.

¶7 Meanwhile, as Nutter struggled to bring Hawk to the ground, the second man hit Nutter in the chest and knocked him to the ground, injuring his hip, neck, and throat. Nutter only saw the back of his assailant as he fled into a nearby car and drove off. Hughes emerged from the store only in time to see the man who had been standing by the trash can driving away. Despite being knocked down, Nutter noted the car's license plate number, which he immediately had Hughes write down. About fifteen to twenty minutes later, both men gave statements, including a description of the car, to Officers Chuck Sprague and Michael Rassley of the Belgrade Police Department.

¶8 On patrol that evening in Bozeman were two Montana State University police officers, Bryan Dellwo and Bryan Allan. After receiving a bulletin with the license plate and description of the car used by Nutter's assailant, they noticed a vehicle matching that description in the parking space corresponding to apartment 102C of a married student housing unit. They ran a check on the license plate and found that the vehicle belonged to Brian Hawk, and as they were checking the vehicle, they discovered a man, later identified as Hawk, lying in the back seat of the vehicle, apparently sedated from the effects–the officers assumed–of drugs or alcohol. In attempting to arouse Hawk and to obtain some identification from him, the officers discovered what appeared to be a magazine subscription slip in Hawk's pocket.

¶9     On the slip, the officers found the name of Heather Prody with the apartment number 102B. Because the car was parked in the slot for 102C, the officers first proceeded to that apartment and knocked on the door. When no one answered, the officers took another look at the slip of paper from Hawk's pocket and went to apartment 102B. Prody, an MSU student, answered the door. The officers spoke briefly with Prody and with the defendant, Christopher Hill, whom they encountered in apartment 102B as well, and then returned to the car. They called Officer Sprague to the scene and updated him on the situation. Before heading back to 102B, Officer Dellwo noted that Hawk's vehicle had a small puppy in it along with three DVDs.

¶10    Prody had spent that day going to classes and driving to Manhattan to purchase a new puppy. With her were a friend and a recent acquaintance, Brian Hawk. Upon returning to Bozeman, the three parted company, and Prody went home, arriving there around 7:30 or 8:00 p.m. Prody did not see either Hill or Hawk until Hill returned home around 1:30 a.m. Hill had been drinking. Within about 20 minutes of Hill's return, Prody noticed police lights outside, and she heard knocking at her neighbor's door at 102C. She looked through the window and saw Hawk's blue car parked in 102C's space; she recognized it as the car that she had the puppy in earlier that day. Prody also happened to take notice around this time of some DVDs in her apartment that had not been there before. Prody did not own a DVD player.

¶11    When the officers spoke to Prody and Hill, Hill told them that he had been home since about 9:30 p.m., which Prody initially confirmed. Later, however, when testifying at trial,

4

she admitted that this was a lie she told out of fear of getting in trouble with Hill. Officer Sprague asked Hill if he knew Hawk, but Hill denied that he knew him. The officer then overheard Prody say that she had purchased a puppy earlier in the day with Hawk. He asked where the puppy was, and Prody told the officer that it was in the car with Hawk. Upon hearing this, Hill became angry, and asked to speak with Officer Sprague outside. Hill then admitted that he knew Hawk but said that he had not seen him and had been with Prody all day. When asked, Hill denied having been at Lee and Dad's IGA. Officer Sprague then spoke with Prody and then again with Hill. At this point, Hill admitted that, contrary to his earlier statement, he had been with Hawk at JR's Lounge, a bar in the same building complex as Lee and Dad's IGA, but he again denied having been at the grocery store. Officer Sprague asked about the three DVDs in Hill's apartment, and Hill said that he had gotten them from Hawk.

¶12    The DVDs from Hawk's car, from the IGA counter where Hawk had partially emptied his pockets, and from Prody's and Hill's apartment were all confirmed by laser scan to belong to Lee and Dad's IGA. At trial, Hill did not dispute that the DVD's were from the IGA.

¶13    Hill was charged with robbery. At his trial, defense counsel moved for a directed verdict at the close of the prosecution's case regarding his identity as the perpetrator. The motion was denied, and Hill was convicted. Hill appeals the judgment of conviction.

STANDARD OF REVIEW

¶14 "We review a district court's denial of a motion for a directed verdict to determine whether, in denying that motion, the district court abused its discretion." *State v. Struble*, 2004 MT 107, ¶ 22, 321 Mont. 89, ¶ 22, 90 P.3d 971, ¶ 22.

¶15 In *State v. Finley* (1996), 276 Mont. 126, 137-38, 915 P.2d 208, 215, *overruled on other grounds by State v. Gallagher*, 2001 MT 39, 304 Mont. 215, 19 P.3d 817, we outlined the standards for applying plain error review. First, the claimed error must "implicate a criminal defendant's fundamental constitutional rights." *Finley*, 276 Mont. at 137, 915 P.2d at 215. Secondly, it must do so in a way such that a failure to review the claimed error "may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *Finley*, 276 Mont. at 137, 915 P.2d at 215. Even if the above criteria are met, plain error review is exercised solely at the discretion of this Court. *Finley*, 276 Mont. at 137, 915 P.2d at 215.

## DISCUSSION

¶16 **Did the District Court abuse its discretion when it denied the defendant's motion for directed verdict on the issue of identification of the defendant as the perpetrator?**

¶17 Hill argues that all of the evidence presented at trial to establish his identity as the man who accosted William Nutter was circumstantial, and that, while circumstantial evidence may be enough to convict, it must be both consistent with a theory of guilt and inconsistent with any other rational conclusion. This argument is based on our now

discarded holding in *State v. Ryan* (1987), 229 Mont. 7, 744 P.2d 1242, and it is a misstatement of the current law. In *State v. Bowman*, this Court made clear that "when circumstantial evidence is susceptible to two interpretations, one which supports guilt and the other which supports innocence, the trier of fact determines which is most reasonable." *State v. Bowman*, 2004 MT 119, ¶ 53, 321 Mont. 176, ¶ 53, 89 P.3d 986, ¶ 53 (citations omitted). Furthermore, "[a] district court should grant a motion for directed verdict of acquittal only when there is no evidence *whatsoever* to support a guilty verdict." *State v. LaMere*, 2003 MT 49, ¶ 19, 314 Mont. 326, ¶ 19, 67 P.3d 192, ¶ 19.

¶18 We pause to clarify the law on this issue. In *Bowman*, we explained that *Ryan's* holding had been superseded by later case law and cautioned that the jury instruction which was premised upon *Ryan* was "not a correct statement of the law" and should no longer be given. *Bowman*, ¶¶ 53, 55. Thus, lest there be any continuing confusion, *Ryan* has been overruled.

¶19 In this case, the facts testified to easily lend themselves to a reasonable interpretation by a jury that Hill was the man who attacked Nutter outside of the IGA. Hill admitted to drinking with Hawk on the night of the robbery in a bar in the same building complex as the IGA, was in possession of goods taken from the IGA that he claimed came from Hawk, lied repeatedly to police that evening, and was in an apartment very near where Hawk was discovered in a car with a license plate and description that matched the car used in the robbery. Prody testified that the DVDs discovered in her apartment had not been there prior to Hill's return. Moreover, the timing of the robbery and Hill's return to the apartment,

7

combined with Hill's demonstrated lies concerning his whereabouts that night, adds additional evidence that permits a reasonable inference that he was involved in the crime. Considering this together, we cannot conclude that there was no evidence "whatsoever" from which a jury could identify Hill as Nutter's assailant and to support a guilty verdict and therefore require a directed verdict. *See LaMere*, ¶ 19.

¶20 Hill offers a brief argument that the State failed to present evidence tending to show that Hill possessed the requisite mental state for robbery. From the above discussion, it is clear that there was also sufficient evidence, given the reasonable inference that it was Hill who attacked Nutter, from which the jury could also have concluded that he possessed the necessary mental state.

¶21 The District Court did not abuse its discretion in denying the motion for a directed verdict.

¶22 **Should this Court invoke the doctrine of plain error to review Hill's claims regarding the State's Information, and if so, did the Information properly charge an offense?**

¶23 Hill argues that because of a defect in the Information he was deprived of his right to receive fair notice of the nature and cause of the accusation against him as guaranteed by the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution. Specifically, he contends that the Information charged him under a theory of accountability for committing robbery, meaning that he was charged with aiding, abetting, or agreeing with Hawk to commit a robbery. Because Hawk was not charged with robbery,

8

but rather with theft, Hill argues that he could not have aided, abetted, or agreed with Hawk to commit a robbery. Hill asserts that, as a result of this claimed error, he could not have had proper notice of the crime for which he was being tried.

¶24  Proper notice of the accusation is a fundamental constitutional right of a defendant; thus, our first consideration for exercising plain error review is satisfied.

¶25  However, a reading of the record shows that Hill had ample opportunity to consider the charge against him, to object to it, and to seek a dismissal of the Information. Hill never objected to the charge, did not move to dismiss, and, further, never indicated the slightest confusion about the nature of the charge against him. Indeed, Hill withdrew his proposed jury instructions regarding robbery and accountability and acquiesced to the State's proposed instructions on those issues. The contention that Hill lacked notice or understanding of the charge against him is simply not supported by the record.

¶26  Had any defect in the Information been brought to light by Hill, the District Court, upon a timely request from the State, could have ordered that the Information be amended to correct the charge. However, Hill offered no objection to the charge throughout the entire proceeding, including jury trial and sentencing. Further, as noted, there is no support whatsoever in the record for Hill's sole claim to prejudice–that he did not have notice of the charges against him. Therefore, we cannot conclude that declining to review this claimed error will result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. Thus, Hill's claim fails the second consideration of plain error review. In light of *Finley*'s admonition

9

that we use plain error review sparingly (*Finley*, 276 Mont. at 138, 915 P.2d at 215), and by discretion, we decline to review the case for plain error.

CONCLUSION

¶27     The District Court did not abuse its discretion in denying the motion for a directed verdict.  We decline to review the case for plain error.

¶28     Affirmed.


/S/ JIM RICE


We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ PATRICIA O. COTTER